STATE of Missouri,
Plaintiff/Respondent,

v.

James BURGETT, Defendant/Appellant.

No. 59180.

Missouri Court of Appeals,
Eastern District,
Division One.

March 2, 1993.

Marcie W. Bower, Columbia, for defendant/appellant.

William L. Webster, Atty. Gen., Michael J. Runzi, Asst. Atty. Gen., Jefferson City, for plaintiff/respondent.

REINHARD, Judge.

Defendant appeals his conviction by a jury of stealing at least $150, a class C felony, § 570.030, RSMo 1986; stealing, a class A misdemeanor, § 570.030; and two counts of second degree burglary, a class C felony, § 569.170, RSMo 1986. He was sentenced as a persistent offender by the court to terms of five years' imprisonment on each of the felony charges and one year on the misdemeanor count. The court ordered the two burglary sentences to run concurrently, as well as the terms on the two stealing charges, but mandated that the burglary and stealing sentences run consecutively. We affirm in part; reverse and remand in part.

The evidence reveals that on December 19, 1988, Catherine McGarry and her grandson went on vacation, leaving the keys to her locked gate, house, car, and garage with defendant's wife, Delores Burgett, so that she could use the car and look in on things while they were gone. Mrs. Burgett returned the car to Mrs. McGarry's garage on December 31, 1988, and checked the house. She noted nothing unusual about the premises, and relocked the doors and gate.

On the night of January 2, 1989, Mrs. Burgett left her home, where she lived with defendant, and travelled to work. Defendant was asleep when she returned at about 7:45 the next morning. She went out to run some errands and returned about twenty minutes later. Defendant then left to get some coffee. Mrs. Burgett noticed that he was carrying a brown paper bag when he left. She asked him what was in the bag; defendant replied that "it was just a few things that he had gotten from a friend." After her husband left, Mrs. Burgett noticed several small empty jewelry boxes in the trash can. The trash can had been emptied the previous night. Defendant returned thirty minutes later, and then left again at approximately 12:30 p.m. Defendant came home again at about 2:30 p.m., went into the bedroom, and returned with the paper bag. Mrs. Burgett asked him about the bag again, and he replied

that it did not pertain to her and was "no big deal".

Mrs. Burgett thought that defendant's actions and responses were unusual and "went snooping" when he left a few minutes later. She found several items in the bedroom closet which she had not seen there before and did not belong to them. Mrs. Burgett recognized one of these items as a radio from Mrs. McGarry's house. She examined the radio and found the name "McGarry" written on it. Mrs. Burgett put the radio back on the shelf and left the house. She completed some errands and went to the McGarry residence. Upon arriving, she noticed that the lock on the front gate was secured in a different manner than she had left it following her most recent visit. She opened the gate, went down the driveway, and found the front door of the house open. The home had been ransacked. She called her mother, who advised her to contact the police.

A sheriff's deputy arrived, and Mrs. Burgett told him that she thought her husband, the defendant, had burglarized the home. She explained that she believed this because "there was stuff at our house that belonged to this house." The deputy called for assistance; Mrs. Burgett accompanied the officers to her home, where defendant was taken into custody. The house was searched, but no stolen material was found.

Defendant was taken to the police station, where he was interrogated by the officers. Defendant initially denied having anything to do with the crime, but then asked to speak to one of the officers privately. Defendant told the remaining officer, "I did it, but I didn't do it for my own gain." He then requested to speak to the officer "off the record". The contents of that conversation were not divulged at trial.

Mrs. McGarry and her grandson returned from their vacation on January 4, 1989. When she arrived at her house, Mrs. McGarry found it in disarray and noted that an adding machine and various items

of jewelry, cutlery, and tools had been stolen. She further noticed that a radio, with her name on it, was missing. Mrs. McGarry's car, which had been parked in her garage, had been beaten with a hammer. The stereo from her grandson's truck, which had also been left in the garage, had been stolen. The grandson valued the stereo at about $200.

Later that afternoon Mrs. McGarry received a telephone call; she identified the caller as defendant. The caller said, "Cathy, this is [defendant].... Cathy, I'm sorry for what I did. I'll come over to your house. I will repair what I damaged and will clean and fix everything up and return your things."[1] Defendant said he would do these things if Mrs. McGarry did not prosecute. Mrs. McGarry told defendant that she would not accept his offer.

At trial, the defense's theory was that someone else committed the crimes. Defendant's sister testified that he had stayed at her house, not his own, from December 31, 1988, through January 10, 1989, because he had been having marital problems.

She stated that defendant ate dinner at her house on the evening of the 2nd and stayed the night there. She testified that she spent the entire day of January 3rd with defendant, and that she received a call from Mrs. Burgett that day, who reported that "she had found some footprints and that they weren't [defendant]'s and she messed them up." Mrs. Burgett testified under cross-examination that she and defendant had been having marital problems and were seeking a divorce at the time of trial. Defendant's mother and another family friend also testified that defendant had been a guest in his sister's home on the night of January 2–3.

▮ In his first point on appeal, defendant claims:

The trial court erred and plainly erred in failing to declare a mistrial, *sua sponte*, when during his opening state-

---

1. Ms. McGarry testified that she was familiar with defendant's voice and that only he and

Mrs. Burgett called her "Cathy".

ment the prosecutor stated that State's witness Delores Burgett told the arresting officer it was her belief that [defendant] had committed the crime, and in overruling [defendant]'s objections when the prosecutor elicited such testimony from [Mrs.] Burgett and [the deputy], ... in that Burgett's conclusion that [defendant] committed the crime was the ultimate issue for the jury to determine, and thus the prosecutor's opening statement, the testimony he elicited, and his closing argument improperly invaded the province of the jury and created a manifest injustice.

We note that no objection was made to the allegedly improper opening and closing arguments at the time they were given, nor was error in allowing such argument alleged in defendant's motion for a new trial.[2] Under direct examination, the prosecutor elicited Mrs. Burgett's testimony that she told the deputy at the scene that she thought her husband "had done it". Defendant's claim of error in the admission of this evidence was not preserved in his motion for a new trial. The deputy testified, under direct examination, that Mrs. Burgett told him that she believed her husband had done it. Defense counsel raised only a general objection to this testimony, which was overruled by the trial court. "To preserve error, an objection must be made with sufficient specificity to advise the trial court of the grounds for the objection. 'A general objection preserves nothing for review, and ordinarily constitutes no objection at all.'" *State v. Bell*, 743 S.W.2d 907, 909 (Mo.App.1988) (citations omitted) (quoting *State v. Cannady*, 660 S.W.2d 33, 36 (Mo.App.1983)).

■ Accordingly, we review defendant's claim under Rule 30.20, to determine whether plain error occurred.

In a plain error case, the alleged error is defectively preserved or not preserved at all. However, the court still may consider errors affecting substantial rights when it deems that manifest injustice or miscarriage of justice has resulted. Before applying the plain error rule, the court must find a "sound, substantial manifestation" and a "strong, clear showing" that injustice will result, and the appellant has the burden of proving that the error amounted to manifest injustice or miscarriage of justice.

*State v. McKinley*, 689 S.W.2d 628, 632 n. 3 (Mo.App.1984). The strength of the State's case is a prime factor in making this determination. *State v. Hawkins*, 714 S.W.2d 673, 676 (Mo.App.1986).

Defendant relies on *State v. Linzia*, 412 S.W.2d 116 (Mo.1967), *State v. Cason*, 596 S.W.2d 436 (Mo.1980), and *State v. Thomas*, 536 S.W.2d 529 (Mo.App.1976). However, none of these cases were decided under the plain error standard. In *Linzia*, our supreme court held that the admission of lay opinion testimony could be proper when it related to identity and was offered by a witness with personal knowledge. Additionally, the court stated that because the complained of testimony in that case had not invaded the province of the jury, there had been no prejudicial error. *Linzia*, 412 S.W.2d at 120.

In *Cason*, the court was confronted with a challenge to the trial court's exclusion of lay opinion testimony regarding the defendant's mental condition. The *Cason* court found that it was not prejudicial to exclude such testimony. *Cason*, 596 S.W.2d at 440. In *Thomas*, a self-defense case, we found that a new trial was warranted when a witness gave her conclusion that she thought a struggle between defendant and

2. During his opening statement, the prosecutor stated:

> [The] deputy ... arrives and meets Mrs. Burgett, asks her what happened. She tells him. She tells him who she thinks done [sic] it. She tells him that she believes her husband did it; and the reason she believes he did it is that Mrs. McGarry's radio is back in their trailer. So the deputy advises her, "we better go get this radio."

During closing argument, the prosecutor made the following remarks to the jury:

> You heard [the deputy] ... responded to [the report of a burglary]. [Mrs. Burgett] testified, [the deputy] verified the first thing she said is, "Cathy's house has been robbed, and I think I know who did it." [The deputy] says, "Well, how do you know this?" "Because I found a radio, and I think my husband did it." [The deputy] says, "We've got to find this radio."

victim "was over". *Thomas*, 536 S.W.2d at 532. However, in that case we were confronted with a properly preserved objection.

In the case at bar, a proper objection should have been sustained. However, the argument and testimony complained of do not rise to the level requiring reversal. The State's case against defendant was strong. Defendant confessed to separate witnesses on two separate occasions. Defendant's wife testified that she saw him bringing things into the house in a paper bag and that she saw empty jewelry boxes in the trash can. She further testified that she found a radio, inscribed with the victim's name, on the shelf of a closet in defendant's bedroom. The jury did not assess punishment, and deliberated only forty-six minutes. Under these circumstances, we find no manifest injustice or miscarriage of justice. *See State v. Boyd*, 706 S.W.2d 461, 465 (Mo.App.1986). Point denied.

In his final point on appeal, defendant claims that the trial court plainly erred in sentencing him as a persistent offender, § 558.016, RSMo 1986, because the amended information charging defendant alleged only that he was a prior offender and the trial court found only that he was a prior offender. The State admits "[Defendant] was not charged, proved or found to be a persistent offender", and concedes that he should not have been sentenced as a persistent offender. Accordingly, we reverse the trial court's order and remand it for entry of sentence in accordance with the judgment actually rendered.

Judgment affirmed in part; reversed and remanded in part.

AHRENS, P.J., and CRIST, J., concur.

E. Alleen HUTCHENS, Plaintiff–Appellant,

v.

ST. LOUIS COUNTY, et al., Defendants–Respondents.

No. 62448.

Missouri Court of Appeals, Eastern District, Division Two.

March 2, 1993.

Alan Agathen, Boisaubin & Agathen, Clayton, for plaintiff-appellant.

John A. Ross, County Counselor, Paula J. Lemerman; Asst. County Counselor, Clayton, for defendants-respondents.

CRANDALL, Presiding Judge.

Petitioner, E. Alleen Hutchens (petitioner), appeals from a final judgment of the circuit court that affirmed the decision of the St. Louis County Board of Zoning Adjustment (Board) denying her petition for a setback variance. The judgment of the circuit court is affirmed.

■ We review the findings and conclusions of the Board, rather than that of the circuit court. *Village of Westwood v. Board of Adjustment of the Municipality of Creve Coeur,* 811 S.W.2d 437, 440 (Mo. App.1991). We limit our inquiry " 'to a determination whether the Board's action is supported by competent and substantial evidence upon the whole record or whether it is arbitrary, capricious, unreasonable, unlawful, or in excess of its jurisdiction.' " *Rice v. Board of Adjustment of the Village of Bel–Ridge,* 804 S.W.2d 821, 822 (Mo.App.1991) (*quoting Cunningham v. Board of Aldermen of the City of Overland,* 691 S.W.2d 464, 466 (Mo.App.1985)). Only where the Board exceeds its authority should the court on review hold the Board's ruling to be illegal and void. *See Wehrle v. Cassor,* 708 S.W.2d 788, 791 (Mo.App.1986).

Petitioner resides in Glasgow Village in St. Louis County. Sometime during 1986 petitioner contracted for the construction of a carport, to be built over an existing driveway at a cost of $8,300.00. No building permit was obtained for the construction. As completed, the carport stood six inches from the sideyard property line. In 1987, due to the location of the carport,

petitioner was advised that she was in violation of zoning regulations under the St. Louis County Code (Code).

Later petitioner sought a building permit for the already constructed carport. After denial of the permit, petitioner appealed to the Board, seeking a setback variance. At the hearing it was undisputed that the carport was subject to a six-foot setback.

In seeking the variance, petitioner claimed that it would cost approximately $5,000.00 to tear down the structure. Petitioner also wanted to maintain the carport so she would not have to contend with scraping ice off the windshield of her car in the winter. Petitioner testified further that the land behind the carport drops off six to seven feet, and that an easement runs across the level portion of the backyard. The only viable location for a carport, other than where it currently stands, would be to use the covered patio behind petitioner's house, next to the present carport, which would, according to petitioner, require destruction of her black walnut trees. Petitioner's neighbor on the side adjacent to the carport, a Mr. Hubert, testified before the Board to the effect that the carport infringed upon the use of his land by blocking sunlight necessary to sustain his rose garden.

The Board denied the request for a variance, concluding that petitioner failed "to establish a hardship upon which a variance request would be necessitated ...," and that the encroachment on the usefulness and enjoyment of her neighbor's property "far outweigh[ed] the usefulness and the purpose of the carport." In reaching its decision, the Board expressly rejected consideration of any evidence of financial hardship.

Petitioner raises two points on appeal. First, she contends that denial of the variance is arbitrary and capricious because of the Board's failure to consider evidence of financial hardship, and secondly, that the Board erroneously denied the variance because "factors militating in favor of the structure and the topographical and practical necessity of placing the structure in the present location" far outweigh the detriment caused by the carport as is.

The ordinance at issue is Code § 1003.-119, pertaining to " 'R–5' Residence District Regulations." *See Casper v. Hetlage,* 359 S.W.2d 781, 789 (Mo.1962). Subsection 7(2)(b) provides as follows:

Sideyard: *No structure* except single-family attached dwellings and detached garages accessory to unattached single-family dwellings *shall be allowed within six (6) feet of any side property line.* Unattached sides of single-family attached dwellings shall be a minimum of six (6) feet from any side property line. Detached garages accessory to unattached single-family dwellings shall be a minimum of three (3) feet from any side property line.

(Emphasis added).

Code § 1004.070(5) authorizes the Board to grant a variance to a sideyard setback where there are practical difficulties or unnecessary hardships in the carrying out of these provisions due to an irregular shape of the lot, topographical or other conditions, provided such variance will not seriously affect any adjoining property or the general welfare....[1]

---

**1.** The Board based its decision denying the petition for a variance on Chapter 89 of the Missouri Revised Statutes (1986). Although not specifying which section authorized the grant of a variance, § 89.090.1(3) so provides, as follows in pertinent part:

\*    \*    \*    \*    \*    \*

In passing upon appeals [the board of adjustment shall have the power], where there are practical difficulties or unnecessary hardship in the way of carrying out the strict letter of such ordinance, to vary or modify the application of any of the regulations or provisions of such ordinance relating to the use,

construction or alteration of buildings or structures or the use of land so that the spirit of the ordinance shall be observed, public safety and welfare secured and substantial justice done.

Section 89.090.1(3) is applicable to cities, towns, and villages; Code § 1004.070(5) applies to St. Louis County. *See* Mo. Const. Art. VI, § 18(c). *See also, Casper,* 359 S.W.2d at 789. Reliance upon the wrong law does not render the Board's decision invalid, however, as both the ordinance and statute have been similarly construed. *Compare Conner v. Herd,* 452 S.W.2d 272, 276

